COURT OF APPEALS OF VIRGINIA

Present:   Judges Fulton, Ortiz and Raphael
Argued at Norfolk, Virginia


CRYSTAL LYNN OLMSTEAD

                                                    MEMORANDUM OPINION[*] BY
v.        Record No. 1076-21-1                      JUDGE JUNIUS P. FULTON, III
                                                    AUGUST 2, 2022
CITY OF NEWPORT NEWS DEPARTMENT
  OF HUMAN SERVICES


FROM THE CIRCUIT COURT OF THE CITY OF NEWPORT NEWS
Tyneka L.D. Flythe, Judge

Charles E. Haden for appellant.

Patrick C. Murphrey, Assistant City Attorney II (Polly Chong,
Guardian *ad litem* for the minor child, on brief), for appellee.


Crystal Lynn Olmstead (mother) appeals the circuit court's order terminating her parental

rights toward her daughter.  Mother argues that the circuit court erred in finding that the evidence

was sufficient to terminate her parental rights under Code § 16.1-283(C)(2).  Specifically, mother

argues that the circuit court erred in finding that the evidence was sufficient to demonstrate that

termination was in the best interests of the child.  Moreover, mother argues that the evidence at trial

demonstrated that the Newport News Department of Human Services (the Department) "failed to

make 'reasonable and appropriate efforts' to assist [mother] 'to remedy substantially the conditions

which led to the child's foster care placement.'"  We find no error and affirm the decision of the

circuit court.

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

BACKGROUND[1]

"On appeal from the termination of parental rights, this Court is required to review the evidence in the light most favorable to the party prevailing in the circuit court." *Yafi v. Stafford Dep't of Soc. Servs.*, 69 Va. App. 539, 550-51 (2018) (quoting *Thach v. Arlington Cnty. Dep't of Hum. Servs.*, 63 Va. App. 157, 168 (2014)). In this case, the Department prevailed below.

Mother and James Armstrong (father) are the biological parents to the child who is the subject of this appeal.[2] On May 16, 2017, mother was before the Newport News Juvenile and Domestic Relations District Court (JDR court) for a foster care dispositional hearing pertaining to the child's brother and a preliminary protective order involving the child and the child's older sister. During that hearing, mother "became upset" and "shattered the glass on the entrance door" as she left the courtroom. Consequently, mother was charged with destruction of property. When she returned to the courtroom for a hearing on the protective order later that day, the court discovered that mother had been in a confrontation with her boyfriend, Calvin Green, who "was [previously] court ordered not to be around the children."[3] Based on concerns regarding "domestic violence within the home," the JDR court removed the child and her sister from

---

[1] The record in this case was sealed. Nevertheless, the appeal necessitates unsealing relevant portions of the record to resolve the issues appellant has raised. Evidence and factual findings below that are necessary to address the assignments of error are included in this opinion. Consequently, "[t]o the extent that this opinion mentions facts found in the sealed record, we unseal only those specific facts, finding them relevant to the decision in this case. The remainder of the previously sealed record remains sealed." *Levick v. MacDougall*, 294 Va. 283, 288 n.1 (2017).

[2] The child has two older siblings who are emancipated and, therefore, not involved in these proceedings. Father also was not involved in these proceedings as he previously signed an entrustment agreement with the Department whereby he agreed that his parental rights would be terminated.

[3] The Department became aware of another incident involving Mr. Green in mother's home in April 2021, which resulted in Mr. Green being charged with "aggravated assault, simple assault."

mother's care.  At the time of the removal, the child's initial foster care goal was to return home concurrent with relative placement.

From the very beginning of the child's foster care placement, the Department was concerned about mother's mental instability, housing, substance abuse, and "general parenting." Consistent with the Department's responsibility to provide reasonable and appropriate efforts to remedy the conditions which led to the foster care placement, the Department not only identified the obstacles to reuniting mother and child but provided services to help her achieve the goal of returning the child to her home.  Mother's parental capacity evaluation demonstrated findings of "narcissistic personality disorder" and a tendency to "exploit others to her own advantage." Mother participated in mental health skill building and individual counseling with a family therapist in 2017 and 2018.  The evaluation also noted a history of substance abuse, including alcohol, cocaine, and marijuana.  Mother received services to address her substance abuse issues in 2017.  However, she tested positive for cocaine as recently as April 2021.  Consequently, a family engagement specialist provided mother with family counseling services with an emphasis on addressing mother's history of substance abuse and stabilizing her housing and mental health.

As for mother's housing, prior to the child's entry into foster care the Department discovered that mother had been living in housing that she could not afford, prompting the Department's "housing broker team [to assist] her with getting out of the housing and putting her into housing that she could afford."  During that period, the housing broker team provided mother "several thousands [of] dollars['] worth of financial assistance . . . to move into a place that she could afford based off of her income."  Nevertheless, mother did not meet her rent obligations and "was again homeless."  By the time the family engagement specialist became involved in this matter when the child was removed to foster care, "referring [mother] to the housing broker team was [no longer] an option."

During the pendency of this case, mother was able to find housing on her own; however, the Department was concerned that she was again "living outside of her financial means." At the time, she received a monthly income of $769 and her monthly rent was $850. According to the Department's family engagement specialist, around this period, "[t]here were times when it did not appear that the information [mother] provided to the agency was forthcoming." Specifically, mother falsely advised the Department that her mother was assisting with her rent payments. By February 2018, mother had defaulted on her rent payments. Several months later, mother met with the family engagement specialist and produced an alleged verification letter, without signatures, indicating that she was current on her rent payments. In speaking with the apartment complex, however, the family engagement specialist discovered that the complex had drafted no such verification letter and that mother continued to be "significantly behind on her rent and at that time her lease was up and that they were not going to be offering her the opportunity to renew her lease."

From October 2018 through March 2019, mother was homeless and staying with "different friends." Mother found new housing, a three-bedroom home, in March 2019 and she was not homeless at the time of the circuit court hearing. The home "always appeared clean and well furnished"; however, the Department remained concerned about mother's ability to pay rent. By July 2019, she was $350 behind on rent. During a meeting with the family engagement specialist at that time, mother produced a "binder to show all of her bills" and asserted that she was current on her payments. Upon further inspection, however, the family engagement specialist discovered that mother "had just made multiple copies [of the bills] and put them in the binder to make it appear[ ] to be more than one payment but it was just really the same bill and she hadn't paid any of the utilities since she had moved in." While the family engagement specialist stated that mother maintained "good contact" with the Department, mother's pattern of

not being forthcoming with her information required the Department to independently verify the information mother would report. The Department received no verification regarding mother's claims that she had stable employment.

The family engagement specialist also facilitated mother's visitation with the child. According to the family engagement specialist, there were instances in 2017 when mother told the child's sister, who resided in the same foster home as the child at the time, "that she felt like harming herself." There was another incident in which mother and the child's sister "were cursing at each other and [mother] was threatening to block [the child's sister] from contacting her on social media." In addition, during that time, mother was frequently late to visitations. The JDR court suspended mother's visitation with the child from September 2017 through July 2018.

As for relative placement, the Department initially considered maternal grandmother as a possible option. The child's sister had lived with maternal grandmother since around the time she had "ag[ed] out of foster care." Thereafter, however, maternal grandmother "did not contact the agency in order to pursue placement with [the child]." The Department then investigated nine other relatives for the child's potential placement, including father and paternal grandmother. These investigations were unsuccessful.

In February 2019, the Department petitioned to terminate mother's parental rights as to the child, then eleven years old. The JDR court entered an order terminating mother's parental rights with respect to the child under Code § 16.1-283(C)(2) in April 2020. Mother timely filed a notice of appeal to the circuit court.

At trial in the circuit court, the Department presented evidence that the child had a positive relationship with her foster mother. The family services specialist testified that the child initially had some "behavioral issues," including damaging property within the foster home, but

had greatly improved over the past two years of living in the foster home. The foster mother "implemented a lot of services and actually assisted [the child] a lot within the foster home." The foster mother addressed the child's "behavioral issues" and worked with the child on "some of her hygiene things that she ha[d] been having trouble with." The family services specialist stated that the child respected her foster mother and was comfortable in the foster home. While living in the foster home, the child also received a variety of services, including medication management, case management, individual therapy, after-school therapy, and in-home therapy.

Mother presented testimony from the child's brother, who was eighteen years old at the time of the circuit court hearing. The child's brother stated that he had been living with mother in the same residence for the previous four months. The child's older sister lived in the residence as well. The child's brother stated that there was no room currently available in the residence for the child if she were to move there, but he offered to move out of the residence to make room for the child if necessary. The child's brother testified that he felt safe in the residence and that mother was capable of taking care of the child and providing for her. On cross-examination, the child's brother admitted that the police had been called to the residence twice during the four months he lived there, due to "violent crimes." The first occasion involved a verbal altercation between him and mother. The second occasion involved mother's boyfriend, Mr. Green, "pistol whipping" the child's brother. The child's brother stated that Mr. Green did not live in the residence but "stay[ed] there from time to time." According to the child's brother, mother and Mr. Green smoked marijuana in the residence.

Mother also testified at trial. She stated she had lived in her current residence between two and three years, and her monthly payments for rent and utilities were between $800 and $850. Mother testified that she was "a little behind" on rent but denied being in danger of eviction. She was not currently receiving any type of housing assistance. As for her

employment, mother testified that she was currently working as a personal care assistant for the elderly, earning $10 per hour and working twenty-five hours per week. Mother acknowledged that Mr. Green still "comes around" the residence and that their relationship had continued throughout the pendency of this case. She also stated she would be able to abstain from marijuana use if the child returned home. When asked about testing positive for cocaine and marijuana as recently as April 2021, mother stated that marijuana helped her with anxiety and that her other prescribed medications must have caused her to have a "false positive" test for cocaine. Mother testified that she was in a better position now to care for the child than where she was at the beginning of this matter.

Before making its findings, the circuit court acknowledged that the child had reached the age of fourteen during the pendency of the proceedings. In accordance with Code § 16.1-283, the circuit court conducted an interview of the child *in camera* and concluded that the child did not object to the termination of mother's residual parental rights.

After weighing the evidence and the parties' arguments, the circuit court found that mother, "without good cause, has been unwilling or unable within a reasonable period of time, not to exceed twelve months from the date the child was placed into foster care, to remedy substantially the conditions which [led] or required the continuance of the child foster placement." The circuit court also found that "it is in the best interest of the child that at this time [mother's] residual parental rights be terminated." The circuit court granted the Department authority to place the child for adoption. Mother's appeal followed.

ANALYSIS

Mother argues on appeal that the Department failed to demonstrate by clear and convincing evidence that it was in the best interests of the child to terminate mother's parental rights. Mother also argues that the "evidence adduced at trial indicated that [the Department]

- 7 -

failed to make 'reasonable and appropriate efforts' to assist [mother] 'to remedy substantially the conditions which led to the child's foster care placement.'" Mother maintains that the Department ceased offering services, contrary to the statutory requirements, after the family engagement specialist became "offended by instances of perceived dishonesty on the part of [mother]." In response, the Department asserts that mother did not raise these specific arguments with the circuit court so this Court should not consider them under Rule 5A:18. The Department notes that mother did not move to strike the Department's evidence and her closing argument made no reference to whether the statutory criteria had been satisfied and instead merely expressed "her willingness, her desire to have her child come and reside with her and that's our request, judge, that you deny the city's petition and restore [the child] to her mother's care." Nonetheless, "[i]n interpreting Rule 5A:18, the Supreme Court has . . . held that 'if a trial court is aware of a litigant's legal position and the litigant did not expressly waive such arguments, the arguments remain preserved for appeal.'" *Moncrief v. Div. of Child Support Enf't ex rel. Joyner*, 60 Va. App. 721, 729 (2012) (quoting *Brown v. Commonwealth*, 279 Va. 210, 217 (2010)). For purposes of this case, we assume without deciding that mother sufficiently preserved her arguments for appeal and address whether the circuit court erred in terminating mother's parental rights.

"On review, '[a] trial court is presumed to have thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests.'" *Castillo v. Loudoun Cnty. Dep't of Fam. Servs.*, 68 Va. App. 547, 558 (2018) (quoting *Logan v. Fairfax Cnty. Dep't of Hum. Dev.*, 13 Va. App. 123, 128 (1991)). "Where, as here, the court hears the evidence *ore tenus*, its finding is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it." *Fauquier Cnty.*

*Dep't of Soc. Servs. v. Ridgeway*, 59 Va. App. 185, 190 (2011) (quoting *Martin v. Pittsylvania Cnty. Dep't of Soc. Servs.*, 3 Va. App. 15, 20 (1986)).

The circuit court terminated mother's parental rights under Code § 16.1-283(C)(2), which provides that a court may terminate parental rights if:

> [t]he parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed 12 months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

"[S]ubsection C termination decisions hinge not so much on the magnitude of the problem that created the original danger to the child, but on the demonstrated failure of the parent to make reasonable changes." *Yafi*, 69 Va. App. at 552 (alteration in original) (quoting *Toms v. Hanover Dep't of Soc. Servs.*, 46 Va. App. 257, 271 (2005)).

"'Reasonable and appropriate' efforts can only be judged with reference to the circumstances of a particular case. Thus, a court must determine what constitutes reasonable and appropriate efforts given the facts before the court." *Harrison v. Tazewell Cnty. Dep't of Soc. Servs.*, 42 Va. App. 149, 163 (2004) (quoting *Ferguson v. Stafford Cnty. Dep't of Soc. Servs.*, 14 Va. App. 333, 338-39 (1992)). The Department "is not required to force its services upon an unwilling or disinterested parent." *Tackett v. Arlington Cnty. Dep't of Hum. Servs.*, 62 Va. App. 296, 323 (2013) (citing *Harris v. Lynchburg Div. of Soc. Servs.*, 223 Va. 235, 243 (1982)); *see also Logan*, 13 Va. App. at 130.

In this case, the circuit court considered that the Department initially removed the child from mother's care "due to an allegation of her being unsafe by way of a preliminary protective order." Following the removal, the Department offered mother services, including housing assistance, mental health services, medical management, substance abuse, and family counseling. While

- 9 -

mother maintained "good contact" with the Department throughout the process, mother demonstrated a pattern of dishonesty in her interactions with the Department and her issues persisted. Mother has experienced a reoccurring problem of housing instability due to her becoming financially overextended in her efforts to secure housing, despite agency counseling and assistance. Mother also tested positive for marijuana and cocaine in April 2021, despite having completed the Department's substance abuse services. Violence in mother's household also persisted. Specifically, the child's older brother was "pistol whipp[ed]" by mother's boyfriend, who had a history of domestic violence but nevertheless had continued a relationship with mother. The circuit court explained that the child's safety was "paramount," and it was concerned about the "continued abuse that is alleged to have occurred in the presence of the home."

Mother also argues that the Department failed to show that termination of mother's parental rights was in the best interests of child. We disagree. "When addressing matters concerning a child, including the termination of a parent's residual parental rights, the paramount consideration of a trial court is the child's best interests." *Tackett*, 62 Va. App. at 319 (quoting *Logan*, 13 Va. App. at 128); *see also King v. King George Dep't of Soc. Servs.*, 69 Va. App. 206, 211 (2018). "'[T]here is no simple, mechanical, "cut and dried" way' to apply the best interests of the child standard." *Bristol Dep't of Soc. Servs. v. Welch*, 64 Va. App. 34, 48 (2014) (quoting *Peple v. Peple*, 5 Va. App. 414, 422 (1988)). "Instead, 'the question must be resolved . . . in light of the facts of each case.'" *Id.* (quoting *Toombs v. Lynchburg Div. of Soc. Servs.*, 223 Va. 225, 230 (1982)).

At the time of the circuit court hearing, the child had been in foster care for over four years. The evidence in the record suggests that the child's current foster placement was providing the child a safe and supportive environment. While in foster care, the child received a

variety of services, including medication management, case management, individual therapy, after-school therapy, and in-home therapy. Moreover, the child's foster mother assisted the child with her hygiene and "behavioral issues." According to the family engagement specialist, the child was comfortable in the foster home and respected her foster mother. Further, based on the circuit court's *in camera* interview of the then-fourteen-year-old child, the circuit court concluded that the child did not object to the termination of mother's residual parental rights.

Despite all the Department's services, mother still was not in a position to care for the child. The circuit court found that "so much time ha[d] passed and there ha[d] been an inability, no matter how much heart [mother had] probably tried to have in it, an inability to make the necessary time frame in order to secure a safe place for [the child] to return to." "It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his [or her] responsibilities." *Tackett,* 62 Va. App. at 322 (alteration in original) (quoting *Kaywood v. Halifax Cnty. Dep't of Soc. Servs.*, 10 Va. App. 535, 540 (1990)). Therefore, based on the totality of the evidence, we will not disturb the circuit court's ruling that there was clear and convincing evidence that it is in the child's best interests to terminate mother's parental rights and that mother was unwilling or unable to remedy the circumstances that led to the child's removal within a reasonable period of time. Code § 16.1-283(C)(2).

Accordingly, we find that the circuit court did not err in terminating mother's parental rights as to her child under Code § 16.1-283(C)(2).

CONCLUSION

For the foregoing reasons, we affirm the decision of the circuit court.

*Affirmed*.

- 11 -